IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DERRICK LAMONE JOHNSON, | § | |
| *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | NO. 3:03-CV-2606-K |
| NATHANIEL QUARTERMAN, Director, | § | ECF |
| Texas Department of Criminal Justice | § | (Death Penalty Case) |
| Correctional Institutions Division, | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Derrick Lamone Johnson ("Petitioner" and "Johnson") has filed an application for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated herein, the application

is denied.

## I. PROCEDURAL HISTORY

Petitioner was convicted of capital murder and sentenced to death by lethal injection. *See*

*State v. Johnson*, No. F99-01708-US (282nd Judicial Dist. Ct., Dallas County, Texas, Nov. 19,

1999). His conviction and sentence were affirmed on direct appeal. *See Johnson v. State*, 68 S.W.3d

644 (Tex. Crim. App. 2002). Petitioner filed an application for state post-conviction relief during

the pendency of his state appeal. The application was denied in an unpublished order. *See Ex parte*

*Johnson*, Writ No. 56,947-01 (Tex. Crim. App. Oct. 8, 2003). Petitioner then filed this action in

federal court. (Doc. #18.)

## II. FACTUAL BACKGROUND

On January 21, 1999, Johnson and Marcus Maxwell kidnaped a young woman while she

was using a payphone at the intersection of Camp Wisdom and Hampton roads in Dallas, Texas.

The Texas Court of Criminal Appeals ("CCA") summarized the evidence as follows:

> On January 21, 1999, LaTausha Curry, age 25, lived with her parents in the Oak
> Cliff area of Dallas.  She owned a red, 1987 Ford Taurus.  That evening she set
> out for Camp Wisdom road to meet someone for a date.  She never returned.  In a
> written confession, appellant admitted that he and an accomplice sexually
> assaulted and killed Curry, and in an oral statement given before the body had
> been discovered, he told the police where Curry's body could be found.  The body
> was found where appellant said it would be.  Appellant's fingerprints were found
> in the victim's car, and DNA testing matched appellant to seminal fluid found on
> Curry's sweat pants.
>
> At around midnight on the evening Curry disappeared, Stella Wilson went to a gas
> station.  At the station, she noticed what she described as a "burgundy" car
> occupied by two young black men.  One of these men later pointed a gun at her
> and demanded her purse, which she relinquished.  In court, she identified
> appellant as the robber and driver of the car.  She also identified Curry's red Ford
> Taurus as the car he was driving.
>
> About 1:30 to 2:00 a.m. on January 22nd, Tanya Robinson, an assistant manager at
> a Jack in the Box, was driving home from work.  She noticed behind her a reddish
> car occupied by two people.  The red car began to chase her and hit her car while
> both vehicles were going about seventy-five miles per hour.  She stopped her car,
> and when the driver of the red car got out of the car, she put the car in reverse and
> tried to run over him.   Robinson then drove back to the Jack-in-the-Box and
> asked an employee to call the police.  She then began to chase the red car to get a
> license plate number.  The police subsequently joined the chase.
>
> During the chase, Officer Larry Byers saw the red car crash and two black males
> run from the car.  Byers identified appellant as the driver.  Robinson caught up
> with the red car after the occupants had fled and therefore was not able to identify
> the driver at trial.  She did, however, identify the victim's Ford Taurus as the car
> that had chased her.  The victim's car was impounded and searched, resulting in
> the recovery of various items, including a pipe made to look like a gun, a mace
> dispenser, and a cell phone.
>
> As a result of this incident appellant was charged with the capital murder of Curry
> under three different legal theories:  murder in the course of kidnapping, murder
> in the course of robbery, and murder in the course of aggravated sexual assault.

> Two different theories of party liability were submitted to the jury: intent to promote the commission of the offense and commission of the offense during a conspiracy.

*Johnson v. State*, 68 S.W.3d at 647-48 (footnotes omitted). These findings are entitled to deference under the AEDPA. This murder occurred during a crime spree spanning several days, and included aggravated robberies (25 RR 12, 52-63, 82-95; 26 RR 34-50, 52-60, 61-71, 82-94, 103-127, State's Ex. Nos. 9, 71, 96, 107-17), aggravated sexual assaults (25 RR 113-21, 123-54), and aggravated assaults with a motor vehicle at high speed. (25 RR 66-79; 26 RR 64-68). The evidence also showed the defendant to have committed an aggravated robbery the month preceding this crime spree (25 RR 99-109), and to have previously committed aggravated robbery (25 RR 44-45 State's Ex. Nos. 77, 79), and burglary. (25 RR 19-31; 33-34, 37-43).

### III. ISSUES PRESENTED

In thirteen grounds for relief, Petitioner complains of instructions to jurors to not consider the law of parole in answering the future-dangerousness special issue (Grounds 1-2), ineffective assistance of trial counsel (Ground 3), the use of prosecution's peremptory challenges to exclude jurors on the basis of their race (Ground 4), the denial of his challenge for cause against venireperson Glen Davis Thomason (Ground 5), the admission into evidence his involuntary written confession (Ground 6), insufficient evidence to support the affirmative answer to the future-dangerousness special issue (Ground 7), the use of vague terms in the punishment special issues (Ground 8), the requirement of ten votes for a negative verdict on a punishment special issue (Ground 9), the impossibility under the Texas Death Penalty scheme of simultaneously restricting the Jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence mitigating against the imposition of the death

penalty (Ground 10), the admission of illegally-seized evidence at his trial (Grounds 11 and 12), and cumulative error (Ground 13). Petitioner also makes a general request for discovery and an evidentiary hearing.

## IV. PROCEDURAL BAR

Respondent asserts a procedural bar to three of petitioner's claims. Federal courts generally will not consider the merits of a claim resolved by the state courts on a state law ground that is both independent of the federal question and adequate to support the judgment. *See Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 885, 151 L.Ed.2d 820 (2002); *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553, 115 L.Ed.2d 640 (1991). Therefore, the Court addresses these issues first and sustains one of respondent's objections.

### *Independent and Adequate State Grounds*

To be independent of the federal question, a state court decision must rely upon a state law ground that is entirely separate from the federal law supporting the merits of the claim. Where the state court relied both on a state procedural rule and on federal law in denying the federal claim, federal courts "will presume that there is no independent and adequate state ground for [the] state court decision [if it] 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.' " *Coleman*, 501 U.S. at 735 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)("If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the

result that the court has reached"). "This presumption may be rebutted, and thus federal review precluded, only if the state court 'clearly and expressly' stated that the state procedural ground was a basis for its decision independent of the federal-law ground." *Foster v. Johnson*, 293 F.3d 766, 786 (5th Cir. 2002)(citing *Coleman*, 501 U.S. at 735, and *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir.1995)).

To be adequate to bar federal review, a state law ground must be "firmly established and regularly followed" by the time as of which it is to be applied, *See Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S.Ct. 850, 857-58, 112 L.Ed.2d 935 (1991), and the state court's application of the procedural rule must not otherwise be exorbitant. *See Lee v. Kemna*, 534 U.S. at 376, 122 S.Ct. at 885. Petitioner bears the burden of showing that a state procedural rule is not adequate to bar federal review, *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997), that sufficient cause and prejudice exist to excuse the procedural default, or that imposition of the bar would result in a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000); *Coleman v. Thompson*, 501 U.S. at 750, 111 S.Ct. at 2565.

### *Analysis*

In Petitioner's first claim, he contends that he was denied his Fifth and Fourteenth Amendment rights to due process and his Eighth Amendment right to be free from cruel and unusual punishment when the trial court instructed the jury to not consider the law of parole in answering the special issue regarding whether there existed a probability that Petitioner would commit acts of violence that would constitute a continuing threat to society. (Pet. at 8-19.) Similarly, Petitioner's second claim complains that he was denied his Fifth and Fourteenth

Amendment due process rights and his Eighth Amendment right to be free from cruel and unusual punishment when three members of the jury panel were instructed by the prosecutor during voir dire to not consider the law of parole in answering the special issues. Respondent contends that these claims are procedurally barred because the state habeas court denied them on the basis that Petitioner failed to make timely objections to these instructions at his trial. (Ans. Br. at 11-12, *citing* SHR at 189, 194.) Petitioner's seventh ground for relief complains of the insufficiency of evidence to support the affirmative answer to the first special issue on future dangerousness. (Pet. at 82-97.) Respondent contends that his claim is procedurally barred because Petitioner raised this issue for the first time in his application for postconviction writ of habeas corpus in the state court, which found that such claim was barred because an attack on the sufficiency of the evidence could only be raised in his direct appeal. (Ans. Br. at 12-13, *citing* SHR. at 189.) For the reasons set out below, the Court finds that petitioner's second claim (improper voir dire instructions from the prosecutor on parole law ) and seventh claim (insufficient evidence to support future dangerousness verdict) are barred from review in this court, but that petitioner's first claim (improper trial court instructions to jury regarding parole) is not.

The Court first addresses the question of whether the state court disposed of these claims on their merits or upon independent state procedural grounds. The Supreme Court in *Coleman v. Thompson*, held:

> In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

501 U.S. at 735, 111 S.Ct. 2546. The last state court to enter orders regarding these claims was the Texas Court of Criminal Appeals ("CCA") on postconviction habeas-corpus review in its order of October 8, 2003, which disposed of all of Petitioner's twenty-two allegations as follows, "We adopt the trial judge's findings and conclusions. Based upon the trial court's findings and conclusions and our own review, the relief sought is denied." *Ex parte Johnson*, No. 56,947-01 (Tex.Crim.App. 2003)(unpublished). Normally, a "denial" of relief would signify a disposition on the merits rather than on independent state procedural grounds. *See Salazar v. Dretke*, 419 F.3d 384, 398-99 (5th Cir. 2005)(citing *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex.Crim.App.2004) and *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex.Crim.App.1997) ); *Bledsue v. Johnson*, 188 F.3d 250, 257 (5th Cir. 1999)(also citing *Ex parte Thomas*, 953 S.W.2d 286, 289 (Tex.Crim.App.1997)); *Jackson v. Johnson*, 150 F.3d 520, 524 (5th Cir. 1998). However, this Court is persuaded that two of these claims were resolved on procedural grounds.

While the Texas cases cited did express the general rule that a "denial" is on the merits and a "dismissal" is on other grounds, they also expressed the primary rule of construction that "[i]n determining the nature of a disposition, we look beyond mere labels to the substance of the action taken." *Ex parte Torres*, 943 S.W.2d at 472 (holding that "[a]lthough we stated that the other claims were "denied" without prejudice, the true effect of our disposition was to dismiss those claims."); *see also Ex parte Thomas*, 953 S.W.2d at 289 (citing *Torres* in support of their conclusion that "[a]lthough we stated that applicant's second application was 'denied without written order,' we should have dismissed the application for want of jurisdiction."). In both *Ex parte Torres* and *Ex parte Thomas*, the CCA determined that prior claims had not been disposed of on their merits even though the court in both cases previously stated that relief had been

"denied".  In *Ex parte Grigsby*, the CCA clarified this rule in cases dealing with sufficiency of

the evidence on postconviction habeas corpus.

> In denying Applicant's attack on the sufficiency of the evidence, we take this opportunity to clarify our disposition of habeas corpus applications where an applicant advances a challenge to the sufficiency of the evidence and we deny the application without written order. In *Ex parte Torres*, addressing whether the applicant's subsequent petitions were barred under Article 11.07, Section 4, of the Texas Code of Criminal Procedure, we determined that "a 'denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits." However, we also held that "[a] disposition is related to the merits if it decides the merits ***or makes a determination that the merits of the applicant's claims can never be decided***." A challenge to the sufficiency of the evidence presents one of those instances where we can never consider the merits of the applicant's claim. Therefore, today, we reaffirm our holding that where an applicant challenges the sufficiency of the evidence on an application for a writ of habeas corpus, and we subsequently dispose of the application by entering a denial without written order, the applicant's sufficiency claim was denied because the claim is not cognizable.

137 S.W.3d at 674 (emphasis in original)(footnotes omitted); *see also Renz v. Scott*, 28 F.3d 431,

432 (5th Cir.1994)(Texas law barring consideration of sufficiency of evidence claims not brought

on direct appeal sufficient to bar federal claim); *Brown v. Collins*, 937 F.2d 175, 178 (5th

Cir.1991); *Kittelson v. Dretke*, 426 F.3d 306, 317 n.26 (5th Cir.2005).  Thus, even though the

state courts had previously stated  that relief had been "denied" in each of the cited cases, the

highest Texas court determined that in each case the disposition had not been "on the merits" of

the claim presented.

Applying the Texas rule to look beyond the "label" to the substance of the prior

disposition, it is clear that the state courts disposed of the second and seventh claims on state

procedural grounds, but it is not clear whether the state courts disposed of the first claim on its

merits or on procedural grounds.  The order of October 8, 2003, merely adopted the trial court's

findings and conclusions, which addressed all three claims.

*First Claim*

The state district court on habeas review found in the alternative that petitioner's first claim herein (1) was procedurally barred for failure to object at trial, (2) was procedurally barred because it had already been raised on direct appeal, and (3) lacked merit. The portion of the state district court's habeas findings which addressed claim one (which was presented as his first state claim along with a second state claim based on a similar state constitutional provision) made alternate findings, in part as follows:

> In his first and second grounds for relief, applicant challenges this Court's instruction forbidding the jury from considering the actual amount of time applicant may have to serve on a life sentence. Relying on the Supreme Court opinion in *Simmons v. South Carolina*, he contends the instruction violates state and federal due process rights and the prohibits against cruel and unusual punishment. *Simmons v. South Carolina*, 512 U.S. 154, 163-64 (1994).

> Procedural Bars

> 5.    The Court finds that applicant could have, but did not object to this instruction at trial. *See Johnson*, 68 S.W.3d at 655.

> 6.    The Court recognizes that the failure to object at trial may waive the error for collateral review. *E.g., Ex parte Dietzman*, 851 S.W.2d 304, 305-06 (Tex. Crim. App. 1993); *Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989).

> 7.    The Court concludes that grounds one and two are procedurally barred because applicant's failure to object at trial waived the error for purposes of collateral review.

> 8.    Alternatively, the Court finds that the complaint in grounds one and two was raised by applicant in his fifth point of error on direct appeal.

> 9.    The Court of Criminal Appeals addressed and rejected applicant's complaint on direct appeal, holding that applicant's reading of the Court's instruction is incorrect. *See Johnson*, 68 S.W.3d at 655.

10. Unless the prior judgment is rendered void or there is a change in the law, claims raised on direct appeal cannot be relitigated through habeas corpus. *See Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994); *Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1993).

11. The Court finds that applicant does not argue or present evidence that the Court of Criminal Appeals' judgment on direct appeal is void or that there has been a change in the law.

12. This Court concludes, therefore, that applicant's first and second grounds for relief are procedurally barred for the additional reason that they were addressed by the Court of Criminal Appeals on direct appeal.

The Jury Charge Was Proper

13. Alternatively, the Court concludes its jury charge was proper.

(SHR at 189-90).

The second procedural bar against relitigating claims is not the type that would bar this Court's review of the merits of the claim. While this state procedural law did not allow the state habeas court to address claims that were already raised and addressed on direct appeal, this procedural bar is specifically excepted from the type of state law that would form an independent and adequate state ground to bar federal habeas review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 n. 3, 111 S.Ct. 2590, 2595 n. 3, 115 L.Ed.2d 706 (1991)(identifying a rule preventing the relitigation on state habeas of claims raised on direct appeal as presenting no bar to federal habeas review); *Bennett v. Whitley*, 41 F.3d 1581, 1582-83 (5th Cir. 1994). Instead, this Court must "look through" to the earlier disposition of this claim upon direct appeal. *Ylst*, 501 U.S. at 804, 111 S.Ct. at 2595.

This brings us to the first procedural bar mentioned by the state habeas court: Johnson's failure to object to the instruction at trial. Such a state procedural ground would preclude federal

habeas review if relied upon by the state court. *See Soria v. Johnson*, 207 F.3d 232, 242-43 (5th

Cir. 2000)(holding in Texas "objections to the jury charge forfeited unless a contemporaneous

objection is made at the time the charge is prepared."). However, the CCA on direct appeal did

not "clearly and expressly" state that it relied upon state procedural grounds. *Foster v. Johnson*,

293 F.3d at 786. The Texas Court of Criminal Appeals opinion on direct review held:

> In point of error five, appellant contends that the trial court gave an erroneous
> instruction in the jury charge regarding parole. The jury charge provided:
>
> > Under the law applicable in this case, if the defendant is sentenced
> > to imprisonment in the institutional division of the Texas
> > Department of Criminal Justice for life, the defendant will become
> > eligible for release on parole, but not until the actual time served by
> > the defendant equals 40 years, without consideration of any good
> > conduct time. It cannot accurately be predicted how the parole
> > laws might be applied to this defendant if the defendant is
> > sentenced to a term of imprisonment for life because the
> > application of those law will depend on decisions made by prison
> > and parole authorities, but eligibility for parole does not guarantee
> > that parole will be granted. *You are further instructed that you
> > cannot consider how long the defendant might be required to serve
> > a sentence that is imposed.* Such matters come within the
> > exclusive jurisdiction of the Board of Pardons and Paroles and are
> > no concern of yours.
>
> (Emphasis in appellant's brief). Appellant did not object to this instruction. He
> now contends that the italicized portion was erroneous and egregiously harmed
> him by denying him a fair and impartial trial. He claims that the italicized
> instruction effectively requires the jury to ignore the earlier instruction that the
> defendant will serve forty calendar years before becoming eligible for parole and
> that such an effect would violate *Simmons v. South Carolina.*
>
> Appellant's reading of the instruction is incorrect. The italicized language does
> not require the jury to ignore the forty-year parole eligibility requirement but
> simply prevents the jury from speculating when the parole board would release a
> life-sentenced defendant.
>
> In any event, the law did not require a parole instruction at appellant's trial.
> Although Article 37.071, § 2(e)(2)(B) now requires a parole instruction to be

given upon defense counsel's request, the amendment that added that provision applies only to offenses committed on or after September 1, 1999. As for appellant's reliance upon *Simmons,* we have consistently rejected appellant's argument based on that case. Point of error five is overruled.

*Johnson v. State*, 68 S.W.3d at 655-56.

In this opinion, the CCA appears to have disposed of this claim on its merits, holding that Johnson's reading of the instruction was incorrect and rejecting his *Simmons* argument on the basis of prior precedent. Therefore, the state court opinions do not appear to have consistently applied state procedural rules in this case to prevent the state appellate court from reaching the merits of the claim. Johnson's failure to object to the instruction may have internally affected the standard of review that the state appellate court applied to its consideration of the merits of this claim (since the term "egregiously harm" from the appellant's argument is referenced). *Se e.g., Jimenez v. State*, 32 S.W.3d 233, 239 (Tex.Crim.App.2000)(holding that if appellant did not object at trial, then the "appropriate standard [of review] is the one for fundamental error in the charge."); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (en banc); *Smith v. Texas*, __ U.S. __, 127 S.Ct. 1686, 167 L.Ed.2d 632 (2007)(Alito, J., dissenting, who would hold that the Texas state court heightened standard of showing "egregious harm" for consideration of jury instructions not objected to at trial to be "an adequate and independent state ground sufficient to support a state judgment that precludes consideration of a federal right."). However, this is not clear from the state court's opinion on direct review, which opinion at most relied upon both state procedural law and federal law in resolving this claim. Therefore, this Court must presume that the state court did not dispose of this claim upon independent and adequate state grounds. *See Coleman*, 501 U.S. at 735. Since the CCA's opinion on direct appeal did not also

contain a clear and express statement that the state procedural ground was the basis for its decision independent of the federal-law ground, this Court declines to impose the state procedural default as a bar to federal review of petitioner's first claim. *See Foster v. Johnson*, 293 F.3d at 786.

### Second and Seventh Claims

However, the same result does not arise from the consideration of the second and seventh claims. The CCA resolved petitioner's second claim for relief on the basis of the state contemporaneous objection rule. The state district court on habeas review noted that this claim was presented in his fourth point of error on direct appeal, and denied as forfeited due to petitioner's failure to object at trial. (SHR at 194-95; SHF ##30-37.) The CCA opinion on direct appeal stated, "[a]s for appellant's claim of fundamental error, we have already held that a failure to object forfeits a claim that a prosecutor's comments about parole are incorrect or misleading. Point of error four is overruled." *Johnson*, 68 S.W.3d at 655 (footnotes omitted). This constitutes a plain statement that the state resolved this claim on independent state grounds. *See Foster v. Johnson*, 293 F.3d at 786. This circuit has already recognized the Texas contemporaneous objection rule as an adequate state ground to bar federal review. *See Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir.2000);.*Amos v. Scott*, 62 F.3d 333 (1995). Petitioner has not shown any cause-and-prejudice or manifest injustice to excuse this procedural default and prevent it from barring this claim from federal habeas corpus review. *See Edwards v. Carpenter*, 529 U.S. at 451, 120 S.Ct. at 1591; *Coleman v. Thompson*, 501 U.S. at 750, 111 S.Ct. at 2565. Therefore, petitioner's second claim for relief is procedurally barred. The Court finds in the alternative that if petitioner's second claim for relief were not procedurally barred, it would be

barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). *See infra*, Section VI.

Similarly, the CCA resolved petitioner's seventh ground of relief presented in this cause on the ground that he failed to comply with the state requirement that a sufficiency of evidence claim be brought only in the direct appeal of his conviction. This claim was presented initially as the thirteenth and fourteenth claims for relief in his post-conviction application for writ of habeas corpus. The state district court on habeas review found, in part, as follows:

> Applicant next challenges the legal sufficiency of the evidence to support the jury's affirmative answer to the future dangerousness special issue. He contends the insufficiency violates due process and the proscription against cruel and unusual punishment.
>
> Sufficiency Claims Are Not Cognizable on Habeas Corpus Review.
>
> 120.   It has long been the general rule that the sufficiency of the evidence cannot be collaterally attacked. *See Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994); *Ex parte Brown*, 757 S.W.2d 367, 368 (Tex. Crim. App. 1988). The proper avenue for applicant to raise his insufficiency claim was on direct appeal.
>
> 121.   A writ of habeas corpus may not be used as a substitute for appeal. *Ramos*, 977 S.W.2d 617.
>
> 122.   Accordingly, this Court concludes that applicant's legal sufficiency complaint is not cognizable in a post-conviction writ of habeas corpus and should not be addressed.

(SHR 210; SHF ## 120-122.) The state habeas court then conducted an extensive analysis in the alternative, concluding that the evidence was legally sufficient to support the jury's verdict. (SHR 210-19; SHF ## 123-50.) The Court finds that the state district court performed a reasonable analysis of the merits of this claim which was supported by the evidence presented at the trial. Accordingly, were this claim not barred, it would be denied on its merits. However, the mere

14

fact that the state court proceeded in the alternative to consider the merits of this claim will not

eliminate or excuse the procedural bar. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct.

1038, 103 L.Ed.2d 308 (1989); *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir.1999).  The Texas

CCA adopted these findings in its decision to deny relief. *Ex parte Johnson*, No. 56,947-01 at 2

(Oct. 8, 2003)(unpublished).

Failing to comply with the Texas requirement to present sufficiency-of-the-evidence

objections on direct appeal is an adequate state ground to bar federal review. *See Dretke v. Haley*,

541 U.S. 386, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004); *Coleman v. Quarterman*, 456 F.3d 537,

546 (5th Cir. 2006), *cert. denied*, __ U.S. __, 127 S.Ct. 2030 (2007); *Renz v. Scott*, 28 F.3d 431,

432 (5th Cir. 1994).  Petitioner has not shown any cause-and-prejudice or manifest injustice to

excuse this procedural default. *See Edwards*, 529 U.S. at 451, 120 S.Ct. at 1591; *Coleman*, 501

U.S. at 750, 111 S.Ct. at 2565.  Therefore, petitioner's seventh claim for relief is also

procedurally barred.

## V.  STANDARD OF REVIEW

The standard of review in federal habeas proceedings is governed by the Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, which provides, in

pertinent part:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a state court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim –
>
> (1)    resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established

15

Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (1996). This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997). Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *See Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.*, 529 U.S. at 413, 120 S.Ct. at 1523. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from

[Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407, 120 S.Ct. at 1520.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts must give deference to state court findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of rehearing). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the prisoner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## VI. PAROLE LAW

In his first three claims, Petitioner complains about the instructions to the jury regarding his eligibility for parole. His first claim alleges that he was denied due process of law and had cruel and unusual punishment imposed upon him in violation of the Fifth, Eighth, and Fourteenth Amendments to the Constitution when the trial court instructed the jury not to consider the law of parole in answering the special issue regarding whether there existed a probability that Petitioner would commit acts of violence that would constitute a continuing threat to society (hereinafter also referred to as the "future dangerousness" special issue). (Pet. at 8-20.) Petitioner's second claim has already been denied as procedurally barred, *see supra* Section IV, but in it he claimed that he was denied these same constitutional rights during voir dire when the prosecutor instructed three members of the jury to not consider the law of parole in answering that future dangerousness special issue. (Pet. at 21-32.) Petitioner's third claim alleges that he was denied his right to the effective assistance of counsel as guaranteed by the Sixth Amendment when his trial defense

counsel failed to object to these instructions.  (Pet. at 33-49.)  For the reasons set out below, these claims are denied.

### *Jury Instructions*

Respondent argues that petitioner's first claim relies upon an extension of *Simmons v. South Carolina*, 512 U.S. 154, 168-69, 114 S.Ct. 2187, 2196 (1994), that would constitute a new rule that he would not be entitled to rely upon due to the non-retroactivity doctrine of *Teague*.  *See Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). (Ans. Br. at 19).  This Court agrees.

 At the time of his trial, Texas law required any person serving a life sentence for a capital murder to serve at least 40 years before becoming eligible for parole. Tex. Gov. Code § 508.145(b)(West 1997).  However, Texas law did not allow an instruction to the jury regarding parole eligibility, *see Smith v. State*, 898 S.W.2d 838, 846 (Tex.Crim.App.1995).  Petitioner presented this claim to the Texas Court of Criminal Appeals on direct appeal, *See Johnson v. State*, 68 S.W.3d at 655-56, and in his postconviction application for writ of habeas corpus (SHR at 80-91), which was denied. *Ex parte Johnson*, Writ No. 56,947-01 (Tex. Crim. App. Oct. 8, 2003)(unpublished).

The Supreme Court in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)*,* observed that federal courts will generally defer to a state court's determination of what a jury should and should not be told about sentencing. *See id.* at 168, 114 S.Ct. at 2196.  In death penalty cases where future dangerousness is an issue and one of the options includes life without parole, the Supreme Court carved out an exception to this general rule.

But if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society.

*Id.* at 168-69, 114 S.Ct. at 2196. Therefore, *Simmons* requires that the jury be instructed about the defendant's parole eligibility "only where state law provides for life imprisonment without possibility of parole as an alternative to the death penalty." *See id.* at 156, 114 S.Ct. 2187; *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000); *Woods v. Cockrell*, 307 F.3d 353, 361 (5th Cir. 2002).

Our Circuit has recognized that such an option was not available in Texas at the time of Petitioner's trial.

In *Simmons*, the Supreme Court held that if the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is ineligible for parole. 512 U.S. at 156, 114 S.Ct. at 2190. This Court has explained that *Simmons* requires that a jury be informed about a defendant's parole ineligibility only when (1) the state argues that a defendant represents a future danger to society, and (2) the defendant is legally ineligible for parole. *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994)(footnote omitted). Miller concedes that *Simmons* is distinguishable because Simmons was not eligible for parole and "would have effectively spent his natural life in the penitentiary." More to the point, because Miller would have been eligible for parole under Texas law if sentenced to life, we find his reliance on *Simmons* "unavailing." *Id.*

*Miller v. Johnson*, 200 F.3d 274, 290-91 (5th Cir. 2000). Since Petitioner would have been eligible for parole if not given the death penalty, he was not entitled to an instruction on his parole eligibility under *Simmons*, and any extension of *Simmons* would be barred under the non-retroactivity doctrine announced in *Teague*. *See Woods*, 307 F.3d at 361-62; *Coleman v. Quarterman*, 456 F.3d 537, 544-45 (5th Cir.2006); *Hughes v. Dretke*, 412 F.3d 582, 591-92 (5th Cir.2005). Therefore, Petitioner's first claim for relief is barred by *Teague*.

### *Ineffective Assistance of Counsel*

In his third claim, Johnson contends that his attorney was constitutionally ineffective for failing to object to these instructions. The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel. U.S. CONST. Amend. VI. The two-pronged standard by which a claim of ineffective assistance of counsel is measured is set forth in *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient. *Strickland*, 466 U.S. at 698. The second prong of this test requires the defendant to show prejudice by demonstrating that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Strickland*, 466 U.S. at 697.

As discussed above, the law would not support the objection to this charge suggested by Petitioner, or even any parole instruction at all. Any such objection by trial counsel would have been pointless since the appellate point thus preserved would have been denied for lack of merit. Therefore, the attorney's conduct was not deficient. *See McCoy v. Lynaugh*, 874 F.2d 954, 963 (5th Cir.1989)(holding that attorney's performance was not deficient for failing to make a futile objection). In fact, counsel obtained more for Johnson than the law would have required. Even though not legally entitled to a parole instruction, defense counsel filed a pretrial motion with a special request that the jury be charged that "[a] prisoner serving a life sentence for a capital felony is not eligible for release on parole until the actual calendar time the prisoner has served without consideration of good conduct time, equals 40 calendar years." (Supp. CR 151.) This

appears to be one of the motions that was not orally argued on the record but the trial judge made rulings "based on what was argued in the Motions themselves." (21 RR 17.) This special request appears have succeeded since the substance of the requested instruction appears in the final punishment charge to the jury. (CR 36-37.) Therefore, petitioner's trial counsel succeeded in obtaining more than the law required and any further objection to these jury instructions concerning parole eligibility would not only have failed to reveal any further instruction to which Johnson was entitled, but would have invited the trial court to further scrutinize such instructions and risk losing the unwarranted benefit he had received. This certainly falls within the wide range of reasonable trial strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Petitioner's third claim for relief is denied for lack of merit.

## VII. BATSON

In his fourth claim for relief, Petitioner complains that he was denied his right to equal protection as guaranteed by the Fourteenth Amendment when the trial court overruled his objection to the prosecutor's exercise of a peremptory challenge as being racially motivated in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Pet. at 50-58.) For the reasons set forth below, this claim is denied.

### *Evaluating* Batson *claims*

The Supreme Court has provided a three-step process to determine whether a prosecutor has exercised peremptory challenges in a manner that violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution. *See Batson*, 476 U.S. at 96-98 (1986); *Hernandez v. New York*, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1865-66, 114 L.Ed.2d 395 (1991); *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005). First, the defendant at

voir dire must make a prima facie showing that the prosecutor exercised it on the basis of a juror's

cognizable racial background. *See Batson*, 476 U.S. at 96-97; *Hernandez*, 500 U.S. at 358;

*Miller-El*, 545 U.S. at 239; *Soria v. Johnson*, 207 F.3d 232, 237 (5th Cir. 2000), *cert. denied*, 530

U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000). Second, the burden then shifts to the proponent

of the strike to articulate a race-neutral explanation for removing the potential juror in question.

*See Batson*, 476 U.S. at 97-98; *Hernandez*, 500 U.S. at 358-59; *Miller-El*, 545 U.S. at 239; *Soria*,

207 F.3d at 237, 239. Finally, the trial court must determine whether the opponent of the strike

has carried his burden of proving purposeful discrimination. *See Batson*, 476 U.S. at 98;

*Hernandez*, 500 U.S. at 359; *Miller-El*, 545 U.S. at 239; *Soria*, 207 F.3d at 239. "[A] defendant

may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination."

*Miller-El*, 545 U.S. at 240 (citing *Batson*, 476 U.S., at 96-97.)

Even though this process involves a shifting of the burden of proof, the ultimate burden of

persuasion rests with, and never shifts from, the opponent of the strike. *See Purkett v. Elem, 514

U.S. 765, 768 (1995); Soria*, 207 F.3d at 239. Once the trial court makes a determination of this

ultimate question of discriminatory intent, such decision constitutes a finding of fact entitled to

great deference. *See Hernandez v. New York*, 500 U.S. at 364. This is due in large part to the

importance of the findings on credibility. *Id*. at 365. Such deference standard existed prior to the

AEDPA, and applies independent of the AEDPA.

### Facts

The trial court conducted individual voir dire of the venirepersons, including Carol Vines,

an African American. The prosecution first examined venireperson Vines through assistant

district attorneys Greg Davis and Tom D'Amore. (9 RR 24.) Then, the defense conducted their

voir dire examination through attorneys Wayne Huff and Karo Johnson. (9 RR 24, 43.)  At the

conclusion of these examinations, the prosecutor challenged this potential juror for cause on the

basis of her answers indicating that she would automatically assess the death penalty if she found

the defendant guilty. (9 RR 64.)  The trial court conducted a further examination of venireperson

Vines regarding this stated ground and received assurances from the venireperson that she would

follow the law and not "automatically" answer the question to the jury about punishment, but

would go by the evidence that was given to her. (9 RR 66-67.)

At the end of this further examination, the prosecutor announced that if the court did not

grant his challenge for cause the he would exercise a peremptory challenge. (9 RR 68).  The trial

court then denied the prosecutor's challenge and the defense attorney immediately objected to the

prosecutor's exercise of a peremptory challenge, noting that she was "a person of African

American descent" as was the defendant, and that this juror "is as strong on paper, at least, and in

her answers to the State as any person that we've selected on this jury." (*Id.*)  The defense attorney

proceeded to argue that this strike has been exercised for reasons of race that are prohibited by the

Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, as well as state

law grounds. (9 RR 68-69.)    Before the trial court responded to this defense objection, the

prosecutor volunteered his reasons for striking this venireperson, as follows:

> Well, the reasons for my striking this juror have nothing to do with race.  The first
> reason I'm using is her failure to disclose her own arrest for the offense of driving
> while license suspended.  That's going to be Case Number 91-56467 in Dallas
> County.  It shows to be the same date of birth, and this juror did not disclose that
> arrest on her questionnaire.
>
> The second reason would be the information she gave to me concerning her
> feelings about police, which I take to be negative.

In this case, I will relate to the Court that I will have testimony that a suburban police officer attempted to stop this particular Defendant while he was driving a stolen car, and that this witness–this juror has indicated that she feels some resentment towards police and the way that they conduct their activities, particularly towards young minorities, and in particular has expressed her resentment, in my opinion, about how a suburban police department has treated her nephew, who happens to be twenty-one years old, which is roughly the age of this Defendant–her nephew is African-American, as is this Defendant–and has also told us that her nephew has been involved in two harrassment lawsuits against police departments in the past and has indicated that he was won both of them.

My third reason would be her answers on Question Number 1, which I–I tend to believe the first response from any juror up here, and her first response to me on Question Number 1 is that she would automatically answer it. And I noted that in your questioning of her that, again, her first response to you was that she would automatically answer that. And coupled with her feelings for everyone who should commit capital murder, I think that she honest has a bias against Question Number 1.

I would also say that I believe this juror has an honest bias against the range of punishment for murder. You will note in her response to me again that after the law was explained to her that she said that she would never consider something as little as five years.

On questioning from the Defense counsel, her first response was again that she would never consider anything as low as five years. When Defense counsel attempted to use an example concerning mercy killing in this case, she said that even in that circumstance that she would not consider anything as little as five years; in fact, her response was the old spouse should have had enough courage to go ahead and kill themselves and not to involve the innocent spouse.

And then she stated to Defense counsel that the only circumstance where she would consider a five-year sentence for the offense of an intentional murder is in the situation of self-defense, which would not even be a murder case.

The last reason that I would submit this juror on is her inability to follow the law on Question Number 3. And again, going back to her first response to me after the law was explained to her on Question Number 3, she will have already decided that to be true beyond a reasonable doubt.

Her response in that regard was that she doesn't want anyone getting out of jail and possibly hurting someone else again and causing harm to their families, and that she would not allow anyone to do that if she'd got as far as Question Number 3.

And so, for that reason, I believe that she has an honest bias against Question Number 3 and, if she encountered that question in this case, would answer that question "No," knowing that her response would result in an automatic death sentence for Derrick Johnson.

(9 RR 69-71.) The court then elicited a response from the defense counsel,

THE COURT:        Mr. Huff, do you have a response?

MR. HUFF:        No–well, as far as the last half of Mr. Davis' presentation, I–I would submit to the Court that only goes to show that she is a strong albeit qualified State's juror.

THE COURT:        All right. The Court finds that the reasons that the State has listed into the record as the reason for the peremptory strike are race neutral.

(9 RR 71-72.) The trial court then excused venireperson Vines from the jury.

### *Analysis*

This Court is particularly mindful of the Supreme Court's opinions in *Miller-El v. Dretke*, which found that the Dallas County District Attorney's office had engaged in a number of actions in the exercise of peremptory strikes that showed patterns of racial discrimination proving that the state courts were unreasonable in their rejection of those *Batson* claims. Therefore, this analysis will pay careful attention to the lessons of *Miller-El*, even though not cited by either party herein.

The Texas CCA on direct appeal lumped these five reasons into three categories as follows:

In response to appellant's objection, the State offered the following reasons for the strike:

1. Vines failed to disclose, on her jury questionnaire, a prior arrest for driving while her license was suspended.

2. Vines's answers to questions revealed a resentment towards police officers.

> 3. Vines had an undue tendency to answer the future dangerousness
> affirmatively, was biased against the minimum range of punishment
> for the lesser included offense of murder, and harbored a bias
> against the mitigation special issue.

*Johnson v. State*, 683 S.W.3d at 648.  The CCA then correctly noted that the defense presented no

evidence before the trial court to rebut any of these reasons. *Id.*  It then applied the three-step

process described in *Batson*, properly finding that the first step became moot when the prosecutor

volunteered his reasons for the strike. *See Johnson*, 68 S.W.3d at 649; *Hernandez v. New York*,

500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).  Then, the CCA examined

each of the stated reasons for the strike separately to determine both whether the stated reason was

race-neutral and whether Johnson had proven purposeful discrimination by showing that the

reason was merely a pretext for discrimination.

It its discussion of the first reason, the venireperson's failure to disclose her prior arrest,

the CCA noted Johnson's complaint that the prosecutor had not inquired further of the

venireperson.  *See Johnson*, 683 S.W.3d at 649.  In *Miller-El*, the Supreme Court addressed the

situation where a prosecutor's reasons for suspected peremptory strikes were provided long after

the trial had been concluded and all jurors discharged.  The Court noted that the Dallas County

prosecutor's failure to engage in any meaningful voir dire examination on a subject that the

prosecutor later claimed to have been concerned about was evidence suggesting that the

explanation was a sham and a pretext for discrimination. *See Miller-El*, 545 U.S. at 246 (citing *Ex

parte Travis*, 776 So.2d 874, 881 (Ala.2000)).  However in this case, the prosecutor disclosed in

open court the information in his possession, which included the Dallas County case number,

name and date of birth of the venireperson. (*See* 9 RR 71) ; *Johnson*, 683 S.W.3d at 649.  Both the

trial court and the defense were given a full opportunity to examine the prosecutor or recall the venireperson if there was any question about the veracity of this information. Since the information was fully disclosed while the venireperson was still available and yet no further examination was attempted, this portion of the case appears distinguishable from the inference assessed in *Miller-El*.

The Texas court focused on an absence of proof in finding that Johnson had not shown that this first reason was either incorrect or a pretext for discrimination. *See Johnson*, 683 S.W.3d at 649. This determination is supported by the record, appears correct, and has not been shown to be incorrect by clear and convincing evidence. The second reason given was developed by the prosecutor during the voir dire examination.

Venireperson Vines testified that the police had harrassed people like her nephew, a 21-year old African American male, by stopping him to see if he was doing anything wrong.

A.   I feel like some police officers, they'd rather sit and try to sit and try to give – give out – issue tickets for small things when, to me, they know, say, for instance, that is a – a dope house on the corner. You know there's a dope house there; go ahead and try to shut that place down so the kids can play in the neighborhood and everybody can be safe, rather than trying to hide around a tree or something just to give a ticket, a speeding ticket or something. I don't agree with that.

Q.   Right. Have you seen that happen yourself or –

A.   Through a family member, I have.

Q.   Okay. Which family member was that?

A.   My nephew.

Q.   Okay. You know, without going into great detail, in general, what happened there?

A.     He – he drives a – a certain type of car which is known is easy to – to steal, and a lot of young men get stopped in a certain area because of the type of car they drive and because they are young, and I feel that the police officers are stopping them and harassing them in hopes that they have warrants out, or no insurance or something like that.

Q.     Right.

A.     If it's – if they did not do any traffic violation, then I don't feel you should be stopped.

Q.     Right.  How old is your nephew?

A.     Twenty-one.

Q.     Okay.  And does he get stopped in – near where he lives?  Is that the situation or –

A.     Yes, and he – he previous – he just moved, and now his mom has to drive his car just so he won't get stopped.  They have switched cars so he won't have that problem.

Q.     Where was he getting stopped at?

A.     Garland, Texas.  And he's won – he's won harass – he's won two harassment cases there already.

(9 RR 40-42.)

The CCA noted Johnson's complaint that the trial court overlooked other testimony given by Vines that was favorable to police officers. *See Johnson*, 683 S.W.3d at 650.  The CCA stated,

> Regarding the State's second reason-the prospective juror's resentment towards the police-appellant contends that the trial court overlooked other testimony given by Vines that was favorable to police officers.  Vines made both positive and negative comments about police officers.  She stated that she thought some officers took advantage of their uniforms and positions to harass innocent victims-including her twenty-one year old nephew-but she also stated that she was grateful to officers who put their lives on the line and her main complaint was that too much time was spent on traffic violations rather than enforcement against serious offenses.  While Vines did give some positive feedback about police officers, the State was entitled

to believe, based upon the negative feedback that she gave, that her presence on the jury would be adverse to the State's interests.

*Johnson*, 683 S.W.3d at 650.

Although not raised by the parties, one question inherent in this explanation deserves discussion: whether this reason is race-neutral on its face even though the venireperson's attitude towards the police arose from police harassment of her nephew, an African American youth, under circumstances that reasonably appear connected with race. The Supreme Court opinion in *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), aids this Court's analysis.

In *Hernandez*, the defendant was Hispanic as were the victims and several witnesses. The prosecutor exercised peremptory strikes to remove apparently Hispanic venirepersons because of the prosecutor's concern over whether their Spanish-speaking ability would prevent them from being able to accept the interpreter as the final arbiter of the testimony of Spanish-speaking witnesses. *Id.*, 500 U.S. at 356-57, 111 S.C. at 1864-65. In upholding the neutrality of the prosecutor's reason, the Supreme Court explained,

> In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); see also *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). " 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct.

2282, 2296, 60 L.Ed.2d 870 (1979) (footnote and citation omitted);  see also *McCleskey v. Kemp,* 481 U.S. 279, 297-299, 107 S.Ct. 1756, 1769-1770, 95 L.Ed.2d 262 (1987).

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.

*Id.*, 500 U.S. at 330-61, 111 S.C. at 1866.  The proffered reason was her attitude towards the police, not her race.  In light of the facts of the instant case which involved an attempted traffic stop by the police of the defendant, a young African-American male, excluding this venireperson from jury service may have a discriminatory effect.  However, so long as peremptory strikes are permitted at all, a prosecutor should be allowed to peremptorily strike a juror that is perceived to be hostile to the police or who, because of her or his life experience, would tend to view certain evidence in a manner adverse to the interests of the State. *See United States v. Moreno*, 878 F.3d 817, 820-21 (5th Cir. 1989).  Therefore, the Court holds that this reason is race-neutral on its face.

The third category of reasons dealt with the venireperson's views on punishment-related issues: an undue tendency to answer the future dangerousness affirmatively, and biases against the minimum range of punishment for the lesser included offense of murder and against the mitigation special issue.  Petitioner characterizes these reasons as indicating a juror who is "too strong a State's juror" and therefore fail to state a sensible, racially neutral justification for the strike that is supported by the record. (Pet. at. 57.)  In considering this objection, the CCA held that,

> the State may exercise challenges against jurors who are biased in ways that are adverse to the defendant, including jurors who cannot consider the minimum end of the punishment range for an offense.  This is so because the State's interest is not merely to convict, but to ensure that justice is done, which includes procuring fair

and impartial jurors. For this reason, the State's ability to challenge veniremen for cause is broader than and encompasses the defendant's ability to challenge a potential juror. The same reasoning applies to peremptory challenges. In ensuring that justice is done, the State may legitimately strike prospective jurors who appear to be unfavorable to the defense in ways that call into question their impartiality. The trial court was entitled to believe that the State did not strike Vines on account of her race. Finding that the State has advanced race-neutral reasons for its peremptory challenge, and that appellant has failed to meet his burden of showing intentional discrimination, we overrule point of error one.

*Johnson*, 683 S.W.3d at 649-50 (citations omitted).

This Court can see how it would seem somewhat disingenuous for a prosecutor to briefly touch on subjects affecting the juror's qualification which make her appear "too strong a State's juror" and then without more examination use this to justify a peremptory strike of a minority juror. *See Miller-El*, 545 U.S. at 246. However, "[t]he state has the right to question prospective jurors about their ability to apply the full range of punishments, including minimum punishments." *Harris v. Texas Dept. of Criminal Justice*, 806 F.Supp. 627, 638 (S. D. Tex., 1992)(citing *Nethery v. State*, 692 S.W.2d 686, 691 (Tex.Crim.App. 1985)). The CCA held in *Nethery* that,

The State's interest is in fair and impartial jurors, in accord with our legal system's basic tenet to insure that every defendant is accorded a fair and impartial trial. The State seeks, or should seek, to uphold the integrity of the jury system. Therefore, the State is permitted to challenge a juror who cannot be fair and impartial because he will not consider the full range of punishment. Whether the State later urges the jury to assess the minimum or the maximum is of no moment.

692 S.W.2d at 691. This expresses goals for the justice system consistent with those of the federal court. Without more, such a suspicion is not sufficient to overcome the heavy burden of deference to the judgment of the trial judge and state courts supported by the other reasons which this Court has already recognized as perfectly legitimate.

Petitioner has not shown the state court findings to be incorrect by clear and convincing evidence, nor has he shown that the state court judgment resulted in an unreasonable application of settled Supreme Court precedent or an unreasonable determination of the facts in light of the evidence before it. Accordingly, petitioner's fourth ground for relief is denied.

## VIII. REFUSAL TO EXCUSE BIASED JUROR

In his fifth claim, Petitioner complains of the trial court's denial of his challenge for cause to excuse venireperson Glen Davis Thomason. (Pet. at 59-70.) For the reasons set out below, this claim is denied.

### *Ineffective Assistance Claim Waived*

Johnson frames his claim as violating his right to the effective assistance of counsel, his right to be free from cruel and unusual punishment, and his right to due process of law as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. (*Id.*) However, he does not present argument or authorities concerning his right to the effective assistance of counsel, nor does he list any conduct by his counsel that is alleged to have been deficient. Instead, he notes how counsel challenged the juror for cause and preserved error for appeal by exercising a peremptory strike and then requesting and receiving additional peremptory strikes. (Pet. at 63.) Johnson does not appear to complain of any deficient conduct by counsel, but rather emphasizes his right to an impartial jury to consider mitigating evidence in accordance with the Sixth and Eighth Amendments. Therefore, the bare conclusory allegations that he was deprived of the effective assistance of counsel briefly referenced in this claim are waived by inadequate briefing. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)(holding that "conclusory allegations of ineffective assistance of

counsel do not raise a constitutional issue in a federal habeas proceeding"). Instead, this Court

will focus on those matters emphasized in the presentation of this claim.

### *Juror's Qualification*

Petitioner contends that Thomason's voir dire examination indicated that he would refuse

to consider youth as a mitigating factor. (Pet. at 59.) The assertion that this juror is disqualified is

based on the following excerpt from the record of his attorney's voir dire examination of this

venireperson regarding the mitigation special issue, which was quoted in the pleadings of both

parties to this action.

> Q.  Okay. One circumstance is – if I understand this, one circumstance you
> would never consider to be a sufficient mitigating circumstance would be
> their youthfulness. That's not something that you would consider?
>
> A.  I presume the person is over seventeen, and – and I consider that to be an
> adult.
>
> Q.  Okay. So, if – as long as they're an adult under the eyes of the law, that's –
> youthfulness would never be something you'd consider, as long as they
> were old enough to be charged with the offense and be tried for death. That
> would be the –
>
> A.  I'm going to presume that – that they – if they are an adult (sic), then – I
> don't – I don't look at seventeen or eighteen as necessarily being youthful
> as far as making decisions.
>
> Q.  So, seventeen or eighteen would never been (sic) a youthful – be youthful
> to you as far as it being a mitigating circumstance?
>
> A.  No, not – not at seventeen or eighteen.

(18 RR 67-68.) This exchange does not indicate that the venireperson was disqualified, but rather

that the defense attorney did not like the juror's views on the mitigation value of certain evidence.

"[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). A capital defendant may challenge for cause any prospective juror who will automatically vote for the death penalty in every case and will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-30, 119 L.Ed.2d 492 (1992); *see also Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence"). However, this does not require a juror to consider any particular circumstance as mitigating, nor does it require a court to excuse a prospective capital juror for cause who might view evidence offered in mitigation as aggravating. *See Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir.2000). Therefore, this would not have required the trial court to excuse this venireperson for cause.

### *Juror's Service*

Even so, this venireperson did not ultimately serve on the jury because Petitioner removed him by the exercise of a peremptory challenge. The CCA addressed this claim on direct appeal,

> Appellant properly preserved error by striking Thomason, asking for more strikes until the trial court denied his requests, and pointing to an objectionable juror. However, the trial court granted appellant an additional peremptory strike; to show harm, appellant must show that the trial court improperly denied challenges for cause on at least *two* different venire members. Because appellant asserts only one challenge for cause error here, harm cannot be established.

*Johnson*, 68 S.W.3d at 656 (footnotes omitted)(citing *Wright v. State*, 28 S.W.3d 526, 535 (Tex.Crim.App.2000)).  This is not alleged to have been resolved on independent state law grounds, but also reveals the absence of the federal claim.

In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Supreme Court addressed a situation involving a defendant's exercise of a peremptory challenge to remove Darrell Huling, a venireperson that the trial court did not excuse for cause on the defendant's motion.

> It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. [*Wainwright v.*] *Witt*, [469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)]; *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).  Had Huling sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove Huling for cause, the sentence would have to be overturned. *Adams* [*v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526].  But Huling did not sit.  Petitioner exercised a peremptory challenge to remove him, and Huling was thereby removed from the jury as effectively as if the trial court had excused him for cause.
>
> Any claim that the jury was not impartial, therefore, must focus not on Huling, but on the jurors who ultimately sat.

*Id.*, 487 U.S. at 85-86, 108 S.Ct. at 2277.  In order to obtain relief on this claim, Johnson must show that someone who "ultimately sat" on his jury did so in violation of his right to an impartial jury. Since this claim complains of a venireperson that did not ultimately serve on Johnson's jury, it fails to meet the test set forth in *Ross*.  Accordingly, Johnson's fifth claim is denied.

## IX.  CONFESSION

In his sixth claim, Petitioner complains that he was denied his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments when the trial court admitted into evidence his involuntary, written confession. (Pet. at 71-81.)  This Court disagrees.

*Law*

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V; *see also Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). However, beginning with *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), the Supreme Court has prohibited the admission of involuntary or coerced confessions in a criminal proceedings under the Due Process Clause of the Fourteenth Amendment. Under this approach, a court must examine the totality of circumstances to determine whether a confession has been "'made freely, voluntarily and without compulsion or inducement of any sort.'" *Withrow v. Williams*, 507 U.S. 680, 688-89, 113 S.Ct. 1745, 1753, 123 L.Ed.2d 407 (1993)(quoting *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *Wilson v. United States*, 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.Ed. 1090 (1896)); *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991); *Colorado v. Connelly*, 479 U.S. 157, 167-70, 107 S.Ct. 515, 522-24, 93 L.Ed.2d 473 (1986). "A confession cannot be the product of official overreaching in the form of either direct or subtle psychological persuasion." *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996). "To be admissible, a confession must be 'free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970)(quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897)). Although promises or inducements can taint the voluntariness of a confession, "a truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing

one's free will." *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir.1995)(quoting *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir.1978)).

### *Analysis*

Petitioner complains that his confession was involuntary because of an implied promise that he would not get the death penalty, even though he was expressly told the opposite. The trial court conducted a pretrial hearing on the voluntariness of the confession outside of the presence of the jury. *See Jackson v. Denno*, 378 U.S. 368, 395, 84 S.Ct. 1774, 1791, 12 L.Ed.2d 908 (1964). At the conclusion of this hearing, the trial court overruled the objections to the voluntary statement and indicated that she would file findings of fact and conclusions of law on the confession. (21 RR 128.) However, no such findings are mentioned elsewhere and do not appear in the record before this Court. According to Texas law, the proper remedy for the failure to enter these findings of fact and conclusions of law is for the appellate court to either abate the appeal to the trial court or order the trial court to prepare and file findings of fact and conclusions of law as required by section 6 of article 38.22 of the Texas Code of Criminal Procedure. *See* TEX.R.APP.P. 34.5(c)(2); *Green v. State*, 906 S.W.2d 937, 940 (Tex.Crim.App.1995); *Berry v. State*, 995 S.W.2d 699, 702 (Tex.Crim.App.1999). Therefore, any complaint regarding the trial court's failure to enter these findings of fact and conclusions of law appear to have been waived by not raising the issue before the Texas Court of Criminal Appeals. As outlined in the petition, the evidence developed before the trial court showed the following:

At 3:30 P.M. on January 25, 1999, Johnson was arrested at his apartment pursuant to a warrant. (21 RR 49; Pet. at 73.) He was transported to the Dallas Police Department, where he signed a written statement about three hours later (6:40 P.M. on that same day). (22 RR 210-11;

28 RR 30; Pet. at 73). Detective James Skelly testified that he first met Johnson at about 6:00 P.M. on January 25, 1999, when Johnson was in the custody of Detective Phil Harding. (21 RR 22; Pet. at 74.) Det. Skelly testified that he administered the *Miranda* warning to Johnson from a *Miranda* warnings card and that Johnson signed and dated that card in acknowledgment that he understood his rights. (Pet. at 74.) The card was admitted into evidence as State's Exhibit No. 22 for record purposes only at the hearing (21 RR 25-26), and for all purposes during the trial. (22 RR 170; 28 RR 28; Pet. at 74.)

Detectives Skelly and Harding began talking to Johnson about a different offense, but the conversation came around to the death of LaTausha Curry. (Pet. at 74.) Det. Skelly testified that Johnson gave an oral statement, admitting the homicide of LaTausha Curry. (Pet. at 74.) Johnson drew a map of the location where the body could be found. (21 RR 27-31.) The map was admitted as State's Exhibit No. 23. (21 RR 32; 22 RR 176; 28 RR 29; Pet. at 74.) Det. Skelly testified that he neither threatened Johnson nor made any promises to induce Johnson to sign the *Miranda* warnings card or draw the map. (Pet. at 74-75.) Further, Det. Skelly testified that Det. Harding did not make any threats or promises in his presence. (21 RR 35; Pet. at 75.)

Upon examination by defense counsel, Det. Skelly testified, in part, as follows:

Q:     You made some comments in your–in your notes about some discussions regarding the death penalty with Mr. Derrick Johnson. Do you remember those discussions?

A:     Generally speaking, towards the end of the interview, once he had made confessions to both of the–of the crime–or, I take that back; after he confessed to the sexual assault and then we were talking about the homicide case, at some point–and I don't remember exactly what point–he did ask us–he said, "If I tell you more about this, can you guarantee that I won't get the death penalty?"

38

We told him, "No, we can't make such guarantees and will not." I said that "If you're honest with us and you tell us what happened, we will make that information known for the court's consideration to use however they see fit, but we will not–you now, we will not, cannot make any guarantees."

Q.      You–you did tell him, though, that–that honesty would be–his honesty would be communicated to the prosecutors and to the Court for whatever use they want to make of that.

A.      That's–that's generally, yes.

Q.      Did that seem to help him, in terms of continuing to cooperate with you?

A.      Well, I assume it did. He did continue and he gave us a voluntary statement. Yes, sir.

(21 RR 41-42; Pet. at 75; Ans. Br. at 38.)

Petitioner characterizes this evidence as proving that "the clear implication to Mr. Johnson was that giving a written statement would be useful to Mr. Johnson and that it could result in the State not seeking the death penalty." (Pet. at 76.) Although Petitioner acknowledged that the police officers did not make direct representations that "the State would not seek the death penalty if Mr. Johnson confessed" or that "things would go easier on Mr. Johnson if he gave a written statement," Petitioner contends that these representations made by the police "directly implied that would be the case." (Pet. at 76-77.) Finally, Petitioner concluded that:

In this case, the promise to convey Mr. Johnson's "honesty" to the court and prosecutor directly implied a positive benefit to Mr. Johnson, made by a person in authority. It is obvious that the death penalty was on Mr. Johnson's mind and the promise made in response to his inquiry regarding the death penalty was one likely to influence an accused to speak untruthfully about his role in the offense.

(Pet. at 77.)

While it appears that the death penalty was indeed on Petitioner's mind, it does not follow that the officer's acquiescence to the extent that he would make Petitioner's cooperation known to

39

the prosecutor and court "for whatever use they want to make of that" is the type of inducement that is "likely to influence an accused to speak untruthfully about his role in the offense." The Texas CCA found on direct appeal that Petitioner's characterization about implied representations were incorrect.

> Appellant characterizes Detective Skelly's comments as an implied representation that appellant's honesty would or could result in the State deciding not to seek the death penalty. That is simply not the case. Detective Skelly plainly told appellant that the police could make no guarantees. Moreover, appellant initiated the idea of a deal to avoid the death penalty. "Having cast [himself] in the role of entrepreneur, [he] cannot expect an appellate court to find implied 'promises' in official responses (to [his] overtures) that are ambiguous at best." Further, Detective Skelly's comments indicated that the police were without authority to make deals but instead could only relay information to the court and prosecutor.

*Johnson*, 68 S.W.3d at 654-55 (footnotes omitted). These findings are supported by the record.

The circumstances of this confession are not otherwise suspect. There was no prolonged period of detention that Johnson was required to endure before confessing, nor has any mental or emotional impediment affecting Johnson's condition been identified that could have affected his voluntariness. Petitioner admits that he received the required *Miranda* warnings prior to the interrogation. No threats or mistreatment are alleged. The sole factor raised by Petitioner is the suggested implication arising from the officer's statement that he would communicate Petitioner's cooperation or "honesty" to the prosecutor and the court. This is patently insufficient to make his confession involuntary.

The state appellate court finding that no promise of leniency was made is correct and has not been shown otherwise by clear and convincing evidence. The state court's ultimate determination has not been shown to be unreasonable. Petitioner's sixth claim lacks merit and is denied.

## X. FAILURE TO DEFINE TERMS IN JURY CHARGE

In his eighth claim for relief, Petitioner claims that he was denied his right to due process of law and had cruel and unusual punishment imposed upon him in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments because the Texas Death Penalty scheme placed his future dangerousness at issue through the application of vague undefined terms used in the special jury instructions that effectively determined the difference between a life sentence and a death sentence. (Pet. at 98-119.) Specifically, Petitioner claims that the trial court's failure to define the terms "probability," "criminal acts of violence," "continuing threat to society," and "mitigating circumstances" violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the most severe penalty available. (Pet. at 98.) However, this argument incorrectly interprets the Texas death penalty process and lacks merit.

### *Law*

In setting forth the constitutional requirements of the capital sentencing process, the Supreme Court in *Tuilaepa v. California,* 512 U.S. 967, 971-72, 114 S.Ct. 2630, 2634-35, 129 L.Ed.2d 750 (1994), made a distinction between two types of sentencing decisions: the eligibility decision and the selection decision. The eligibility decision fits the crime within a defined classification that narrows the class of persons eligible for the death penalty by utilizing at least one aggravating factor that both (1) applies only to a subclass of persons convicted of murder and (2) is not unconstitutionally vague. *Id.*, 512 U.S. at 972, 114 S.Ct. at 2635. In contrast, the selection decision "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's

culpability." *Id.* Noting the potential tension between these two inquiries, the Court explained the

different requirements as follows:

> "Once the jury finds that the defendant falls within the legislatively defined
> category of persons eligible for the death penalty, . . . the jury then is free to
> consider a myriad of factors to determine whether death is the appropriate
> punishment." *Ramos, supra,* 463 U.S., at 1008, 103 S.Ct., at 3457. Indeed, the
> sentencer may be given "unbridled discretion in determining whether the death
> penalty should be imposed after it has found that the defendant is a member of the
> class made eligible for that penalty." *Zant, supra,* 426 U.S., at 875, 103 S.Ct., at
> 2742; see also *Barclay v. Florida,* 463 U.S. 939, 948-951, 103 S.Ct. 3418,
> 3424-3425, 77 L.Ed.2d 1134 (1983) (plurality opinion).

*Id.*, 512 U.S. at 979-80, 114 S.Ct. at 2639.

Noting these distinct decisions, the Fifth Circuit Court of Appeals has determined that the

Texas capital penalty process places the eligibility decision in the guilt-innocence phase of the

trial, and the selection decision in the punishment phase. *See Turner v. Quarterman*, 481 F.3d

292, 300 (5th Cir. 2007), *petition for cert. filed*, __ U.S.L.W. __ (U.S. Jul 16, 2007)(No.

07-5425). Since the terms complained of are used in the selection decision rather than the

eligibility decision, these terms are not subject to the same definitional requirements as terms that

are used in the eligibility decision. This Circuit has consistently approved the use of the terms

"probability," "criminal acts of violence," and "continuing threat to society" without definition

over objections that they are unconstitutionally vague as used in these sentencing instructions. *See*

*Turner*, 481 F.3d at 299-300 (holding terms "probability," "criminal acts of violence,"and

"continuing threat to society" not unconstitutionally vague); *Leal v. Dretke*, 428 F.3d 543, 553

(5th Cir. 2005)(holding that terms "probability," "criminal acts of violence,"and "continuing

threat to society" needed no definition); *Hughes v. Johnson*, 191 F.3d 607, 615 (5th

Cir.1999)(upholding use of term "probability"); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th

Cir.1996)(overruling complaint that Texas punishment special issues unconstitutionally vague); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993)(upholding use of terms "deliberately," "probability", "criminal acts of violence,"and "continuing threat to society" as having a "common-sense core of meaning that criminal juries should be capable of understanding"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir.1993)(upholding use of terms "deliberately," "probability," and "society" without definition); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987) (upholding use of term "deliberately" as its "common meaning is sufficiently clear to allow the jury to decide the special issues on punishment"); *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir.1984) (upholding the terms "deliberately," "probability," and "criminal acts of violence" as having "plain meaning of sufficient content" to warrant their inclusion in sentencing instructions).

### *Facts*

At the conclusion of the punishment phase, the trial court submitted to the jury three statutory special issues.  The first one asked, "Do you find from the evidence beyond a reasonable doubt that there is a ***probability*** that the defendant, Derrick Lamone Johnson, would commit ***criminal acts of violence*** that would constitute a ***continuing threat to society***?" (CR 39)(emphasis added).  The third special issue asked, "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Derrick Lamone Johnson, that there is sufficient ***mitigating circumstances*** or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"  (Pet. at 101-03; CR 41)(emphasis added).

*Analysis*

Petitioner complains of the trial court's use of the terms "probability," "criminal acts of violence," "continuing threat to society," and "mitigating circumstances" in the jury instructions without further definition. However, this Circuit has consistently rejected similar complaints and has specifically upheld the use of at least three of these terms without definition in the face of complaints that they are unconstitutionally vague aggravating circumstances that would require definition in the instructions. Therefore, this Court is bound by circuit precedent. *See Turner*, 481 F.3d at 299-300; *Leal*, 428 F.3d at 553; *Hughes*, 191 F.3d at 615; *Woods*, 75 F.3d at 1033-34; *James*, 987 F.2d at 1120; *Nethery*, 993 F.2d at 1162; *Thompson*, 821 F.2d at 1060; *Milton*, 744 F.2d at 1095-96.

The remaining term, "mitigating circumstances", does not require further definition for at least two reasons. First, it is not used in the eligibility decision where the class of persons eligible for the death penalty is narrowed. *See Tuilaepa,* 512 U.S. at 971-72, 114 S.Ct. at 2634-35; *Turner*, 481 F.3d at 299-300. Second, it is not an aggravating circumstance but a mitigating factor that must be afforded a broad interpretation to give the jury the utmost latitude in exercising its discretion that the death penalty should not be imposed. *See Tuilaepa,* 512 U.S. at 979-80, 114 S.Ct. at 2639. Therefore, the trial court was correct to not add any definition that would have hindered the jury's discretion in the selection decision at the punishment phase of the trial.

In sum, this claim is not supported by clearly established Supreme Court precedent and in fact, circuit precedent binds this Court against granting relief on this claim. Accordingly, Petitioner's eighth claim for relief is denied.

## XI. TEN-TWELVE RULE

In his ninth claim, Petitioner complains that he was denied his right to due process of law and had cruel and unusual punishment imposed upon him in violation of the Eighth and Fourteenth Amendments because the Texas Death Penalty scheme requires at least ten jurors to agree (i.e., ten "no" votes) in order for the jury to return a negative answer to the punishment special issues, and that the lack of an instruction on the effect of a jury deadlock exacerbated this Constitutional defect. (Pet. at 120-129.) Respondent asserts that these claims lack merit, are foreclosed by circuit precedent, and are barred by the nonretroactivity rule of *Teague*. (Ans. Br. at 53.) This Court agrees with Respondent.

### *Law*

Petitioner relies upon *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which overturned a death sentence because of jury instructions that created a substantial probability that jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of one or more particular mitigating circumstances. In *Mills*, the jury was instructed to first unanimously determine whether certain specific aggravating and mitigating factors existed, marking "yes" or "no" beside each listed factor, and then to weigh those factors in determining whether to assess death. The Supreme Court found a substantial probability that jurors would believe that they were precluded from considering any mitigating factors unless all 12 jurors agreed on the existence on the same specific factors, and result in a virtually automatic death sentence even where the jurors may otherwise have concluded that death was inappropriate. *Id.*, 486 U.S. at 373-74, 377-78, 108

S.Ct. at 1865, 1867. That instruction is "wholly dissimilar" to the one used in Texas, as set out in the following two paragraphs. *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996).

The Supreme Court has interpreted *Mills* to mean that "each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina,* 494 U.S. 433, 442-43, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994). In concluding that the prohibition in *Mills* did not apply to the Texas instructions, the Fifth Circuit Court of Appeals in *Jacobs* observed, "[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Jacobs*, 31 F.3d at 1329.

The Fifth Circuit Court of Appeals has also found this *Mills* argument to be barred by the nonretroactivity rule of *Teague v. Lane*. *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93 (5th Cir.1993). The Court of Appeals in *Alexander* held,

> Because we find *Webb* materially indistinguishable from the instant case, we conclude that Alexander's argument is *Teague*-barred as well. The petitioner in *Webb* made the same argument as Alexander–that the Texas 10-12 rule compelled the jury to vote "yes" on the special issues–and he relied on the same authority–*Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *See Webb*, 2 F.3d at 95. We concluded in *Webb* that the principles of *Mills* did not dictate the rule urged by the petitioner, *see Webb*, 2 F.3d at 96, and precedent constrains us to reach the same conclusion here.

*Alexander*, 211 F.3d at 897. The Court of Appeals went on to observe that the Constitution creates no right to instruct the jury on potential deadlock. *See id.* at 897 n. 5 (citing *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370 (1999)).

*Facts*

The instructions submitted by the trial court to the jury in the punishment phase provided,

in part, as follows:

> The burden of proof in this phase of the trial is on the State as to Special Issues Nos. 1 and 2; and the State has the burden of proof to prove beyond a reasonable doubt that the answers to Special Issues Nos. 1 and 2 submitted to the jury should be "Yes."  The jury may not answer the Special Issues Nos. 1 and 2 "Yes" unless the jury agrees unanimously on such answers.

\* \* \*

> The jury may not answer Special Issues Nos. 1 and 2 "No" unless ten or more jurors agree.  If any juror has a reasonable doubt as to the answer to Special Issues Nos. 1 and 2, that juror shall vote "No" as to that issue.  The jurors need not agree on what particular evidence supports a negative answer.

\* \* \*

> You are further instructed that you are not to consider or answer Special Issue No. 3 unless you have returned an affirmative finding on Special Issues Nos. 1 and 2, and if you do consider and answer that Special Issue, you must do so under the conditions set forth following that issue.

\* \* \*

> You are to answer the following issue only if you have returned affirmative findings on Special Issue No. 1 and Special Issue No. 2 above.

SPECIAL ISSUE NO. 3

> Do you find from the evidence taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Derrick Lamone Johnson, that there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

> You are instructed that in answering this issue, you shall answer this issue "Yes" or "No".  You may not answer the issue "No" unless the jury unanimously agrees, and you may not answer the issue "Yes" unless ten (10) or more jurors

47

agree. The jury need not agree on what particular evidence supports an affirmative finding on this issue. The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(CR 34-41.) In each special issue, unanimity was required to return a verdict that would support death, but only ten jurors were required to agree upon a verdict that would support a life sentence. Also, affirmative answers were required on the first two special issues and a negative answer on the third special issue in order to support a death sentence, but any one answered otherwise would result in a life sentence. If the jury was unable to answer any of these issues, the result would be a life sentence. *See* TEX.CODE CRIM.PROC. ANN., art. 37.071(2)(g) (Vernon 1993); *Jackson v. State*, 17 S.W.3d 664, 677 (Tex.Crim.App. 2000).

### *Analysis*

Petitioner appears to argue separately for a "Majority Rules" coercion of jurors and a "*Mills* Principle" violation. (Pet. at 123-126.) However, there appears to be no meaningful distinction between these two arguments. Both of them rely on *Mills* for the proposition that the special issue instructions given in this case would lead a reasonable juror to believe that an individual juror's vote in favor of returning a life sentence would be worthless unless some threshold number of jurors, in this case ten, agreed. (Pet. at 123, 125.) Petitioner further complains that this problem was exacerbated by the fact that the jury was not instructed that a failure to so agree regarding any special issue would result in a life sentence, and that this lack of instruction invited speculation and confusion among jurors, subjected the process to arbitrariness, and made the sentencing determination unreliable. (Pet. at 123-125, 128.)

As observed in *Jacobs*, the Texas special issues do not reflect the constitutional violation presented in *Mills* since each juror in Texas is fully allowed to consider any mitigating evidence

and there is no requirement that any agree on precisely what circumstance may be mitigating. *Jacobs*, 31 F.3d at 1329.  Petitioner was also not entitled to an instruction regarding the effect of the juror's failure to agree on a verdict. *See Alexander*, 211 F.3d at 897.   These arguments would constitute an extension of *Mills* at best, and have already been considered a new rule in this Circuit which would be barred by the nonretroactivity principles in *Teague*. *See id.*; *Webb*, 2 F.3d at 95.  Therefore, Petitioner's ninth claim for relief is barred by *Teague*, and in the alternative lacks merit, and is denied.

## XII. JURY DISCRETION

In his tenth claim, Petitioner complains that he was denied his right to due process of law and had cruel and unusual punishment imposed upon him in violation of the Fifth, Eighth and Fourteenth Amendments because the Texas Death Penalty scheme created the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against the imposition of the death penalty. (Pet. at 130-141.)

Petitioner's arguments have already been found by the Fifth Circuit Court of Appeals to be meritless and foreclosed by precedent. *See Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006)(also holding such argument barred by the nonretroactivity doctrine of *Teague*).  Petitioner's argument incorporates and almost exclusively relies upon the objections to death penalty procedures contained in Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141, 1143-59, 114 S.Ct. 1127, 1128-38, 127 L.Ed.2d 435 (1994), as applied to the Texas death penalty scheme.  However, the Supreme Court has expressly approved the Texas death penalty sentencing procedures, *See Jurek*

*v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and has not approved Justice

Blackmun's objections. Besides this dissenting opinion, Petitioner cites to a dissenting opinion of

the Texas Court of Criminal Appeals, *See Wilkerson v. State*, 881 S.W.2d 321, 330

(Tex.Crim.App. 1994)(Baird, J. dissenting), for the broad proposition that the Texas procedure

reduced appellate review of sentencing factors to a mere recital of historical fact when in fact that

dissenting opinion was merely complaining of the way that the majority had conducted its review

of the sentencing factors in that case. Even so, these dissenting opinions do not constitute clearly

established federal law as determined by the Supreme Court and cannot be relied upon to grant

federal habeas relief in light of 28 U.S.C. § 2254(d)(1).

Outside of these dissenting opinions, Petitioner cites only to *Penry v. Lynaugh,* 492 U.S.

302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256, 278-79 (1989)(*Penry I*) for the proposition that

the "focus on aggravating circumstances, to the exclusion of mitigating evidence, clearly violates

the constitutional mandate of individualized sentencing." While such a focus would be improper,

it does not reflect the sentencing procedure used at Petitioner's trial. *Penry I* addressed a

deficiency in a prior version of the Texas capital sentencing procedure, which was rectified by the

inclusion of the separate special issue on mitigation, sometimes referred to as the "*Penry* special

issue," which was submitted to the jury in the sentencing phase of Petitioner's trial. *See Moore v.*

*State*, 999 S.W.3d 385, 407-08 (Tex.Crim.App. 1999); *Martinez v. Dretke*, 426 F.Supp.2d 403,

426 (W.D. Tex., 2006); *Penry v. Johnson*, 532 U.S. 782, 803, 121 S.Ct. 1910, 1923-24, 150

L.Ed.2d 9 (2001)(*Penry II*); (CR 34-41.) Therefore, *Penry I* does not advance Johnson's

argument in this case, and this claim is without authoritative support. Accordingly, Petitioner's

tenth claim is denied for lack of merit.

## XIII. ILLEGALLY OBTAINED EVIDENCE

In his eleventh and twelfth claims, Petitioner complains that he was denied his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments and his right to be free from illegal search and seizure in violation of the Fourth and Fourteenth Amendments when the trial court admitted illegally-obtained evidence. (Pet. at 142-61.) However, such claims are not cognizable on federal habeas corpus review of state convictions.

### *Law*

The Exclusionary Rule may not be invoked in federal habeas corpus proceedings to collaterally challenge the admission of evidence obtained as a result of illegal searches and seizures unless the state court did not afford a full and fair opportunity to litigate such Fourth Amendment claims. *See Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *Swicegood v. Alabama,* 577 F.2d 1322, 1324 (5th Cir.1978).

### *Analysis*

Petitioner does not contend that he was not given a full and fair opportunity to litigate these claimed violations of the Fourth Amendment protection against illegal search and seizures. Indeed, he was not only afforded ample opportunity by state law to litigate these claims, but he actually and extensively challenged these searches and seizures by pretrial motions upon which evidentiary hearings were conducted outside of the presence of the jury prior to and during the trial (Supp. CR 3; 21 RR 48-128; 25 RR 9-11), by objections at trial (22 RR 136-44; 25 RR 6-7), by points of error (St. App. Br. at 71-84) upon which the Texas Court of Criminal Appeals reviewed the trial court's rulings on direct appeal and issued a published opinion. *See Johnson*, 68 S.W.3d at 652-54. There has been no allegation that the processes provided by a state to fully

and fairly litigate these fourth amendment claims were in any way inadequate or applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits. *See Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006), *cert. denied*, __ U.S. __, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007); *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir.1980). Therefore, the state court did afford Johnson a full and fair opportunity to litigate these Fourth Amendment claims. Petitioner's eleventh and twelfth claims are denied as not cognizable on federal habeas corpus review.

## XIV. CUMULATIVE ERROR

In his thirteenth and final claim, Petitioner complains that he was denied his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments by the cumulative effect of the above-enumerated constitutional violations. (Pet. at 162-165.) However, there is no error properly before this Court to cumulate.

### *Law*

The cumulative error doctrine is reflected in the *en banc* decision in *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992), which set forth the following test for relief:

> federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process."

(quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400-01 (1973). The Fifth Circuit Court of Appeals has indicated that this standard requires that "where individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'" *Turner*, 481 F.3d at 301.

### *Analysis*

All of the claims made in this proceeding are either unexhausted and procedurally barred, barred by the *Teague* nonretroactivity doctrine, not cognizable on federal habeas corpus review, or lack merit. There are no errors of a constitutional dimension properly before the Court. Therefore, there is nothing to cumulate. Petitioner's thirteenth claim is denied.

## XV. EVIDENTIARY HEARING

Petitioner requested that an evidentiary hearing be held on all claims raised by the petition and that discovery be granted pending said evidentiary hearing. (Pet. at 166.) When the pleadings demonstrate a factual dispute, that, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded him a full and fair evidentiary hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing. *See Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999). Since the pleadings demonstrate that there is no factual dispute upon which federal habeas corpus relief can be granted, no evidentiary hearing is warranted.

## XVI. CONCLUSION

Petitioner's petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED.

DATED: September 18th, 2007.

ED KINKEADE
UNITED STATES DISTRICT JUDGE